Case number 17-4132 Sterling Jewelers Incorporated v. Artistry Ltd. All arguments not to exceed 15 minutes per side. Mr. Bruce Baber for the appellant. Morning. Morning, Your Honors. May it please the Court. My name is Bruce Baber from the firm of King & Spaulding, and I'm here today on behalf of Artistry Ltd., the trademark infringement plaintiff, which is the defendant and counterclaim plaintiff, in this action brought for declaratory judgment by Sterling Jewelers, the largest retail jeweler in the United States. I've asked the Deputy Clerk to reserve three minutes of my time for rebuttal. As Your Honors know, we're here on Artistry's appeal of the District Court's grant of summary judgment to the accused infringer, and we're here for this Court to review that decision de novo, as you've said recently several times, with fresh eyes. On summary judgment, a District Court must view all the evidence in the light most favorable to the nonmovement. It must draw all reasonable inferences in favor of the nonmovement. It cannot weigh the evidence, and it cannot make credibility determinations. If the District Court finds there are genuine issues of material fact when it looks at the evidence in the record through those prisms, that's the end of it. Summary judgment cannot be granted. So we have these cases that say this inquiry is a question of law. What does that really mean to you? Well, if you're talking about the ultimate likelihood of confusion question, Your Honor, this Court has actually some jurisprudence on that that's different from most circuits. The Court has said— And I'm aware of that. Just tell me how you think it works in our circuit. I mean, we're out at this panel. I think it works here is that the Court has said the question is a mixed question of law and fact, but that once you have the foundational facts established, this Court can look as a question of law whether or not they could result in likelihood of confusion. I think that's how this Court does it. But there are some developments in the past few years that I don't think the Court has looked at in terms of how it has expressed that sort of review standard. In the Hanna Bank case in 2015, the Supreme Court made it very clear that mixed questions of law and fact are questions for juries and that the way it works with a mixed question is the district court gives the jury correct instructions of law and it is up to the jury not only to find subsidiary facts or underlying facts, but also it's the jury's constitutional responsibility to decide the ultimate mixed question issue. So I think the Court can always, in sort of cases at the extreme, you can always say, well, as a matter of law, this can't be such and such, right? Whether it's a mixed question, whether there's some question of law aspect to it, but I think the Court's cases are pretty clear that likelihood of confusion in this circuit, unlike some other circuits, is viewed as a mixed question of law and fact. So I think that then triggers… So has your client ever sold to Kay's? We've never sold to Kay's, Your Honor, no, but we have sold to many, many, many of Kay's competitors and that's where the rub comes in, okay? We have the evidence in the record that the district court simply ignored, which is… When you say Kay's competitors, would you also include jewelers that have retail stores and malls? Absolutely, Your Honor, and that's what – I want to start at a high level, okay? What the evidence in this record shows is that, viewed in the light most favorable to artistry,  both in the online world and in the bricks-and-mortar world, I can be exposed to both. My client's artistry products, branded that way, and Sterling's artistry products, branded that way. In the online world, you can go to the Sterling website. You can go to the Kay Jewelers website, the Zales website, but you can also go to – Can online purchasers buy from your client? They cannot buy directly from our client, no, Your Honor, but they can buy directly from our customers. And that's the issue. That's retailers, but you've got me as a wholesaler. That's correct, Your Honor. We are the wholesaler. Can I ask what exactly you're doing? Is your client buying from some company that mines it or are you adding – Are you designing it or are you buying in bulk and then selling to different retailers? Artistry sources its products from designers in various places, some in the – So it doesn't add design? No, it does in some cases design its own, and in other cases it buys designs that others create for them. What's the percentage? Like how does it break down? That I don't know, Your Honor. I believe it's – I don't know that we have any evidence in the record on that. But what artistry does is it sources its products, and then it sells them to the wholesale jewelers who, in turn, offer them to consumers. So if I'm looking for jewelry products online and I go to one of Artistry's clients' websites, and we attached an example to our brief in the district court, there really is no dispute about this. Our customers use our mark on their websites to identify our products, just like Sterling does it at their Belden stores, at their Goodman stores, and at their Kay stores. So a consumer can see both. In the real world, a consumer can be in a mall. They can go to a Zales or a Kay's jewelry store. They can see a display. It says Artistry Diamonds. They could go across the mall to an independent jeweler who buys from us, and they will see our products, the testimony of our witnesses. They may very well see our catalog with our name on it, and they could be directly across the mall from each other, or they could be across the street. So in both the real-world environment of bricks-and-mortar stores. I just want to make sure I got your theory of confusion down. I thought it was a little more the risk that the retailer, your retailers, would be anxious about buying from Artistry because mall stores are using it, and they wouldn't think it's the same quality. What I hear you saying today, and maybe I just didn't appreciate it, is there are two distinct theories of confusion. One is the problem that the retailer won't buy from you anymore, but the second is you actually think there's a problem of consumer confusion with the consumers being the same people, the end buyers. The answer is yes, you think both. But do you have any evidence? We have evidence of both in this case. Okay, that's what I didn't think you had. Just to be clear, it happens all the time that you think I'm saying one thing and I'm saying something else, so when you answer the wrong question, I find myself discouraged. Mike, the question is ultimate consumers, so the people buying the diamond engagement ring, do you have evidence in the record that says those people were confused and they thought they were buying one and they were actually buying the other? We have one very clear instance, Your Honor, of a customer. Go ahead. Where is it? It is in the testimony of Susan Klempt, I believe it is, and they asked her about one of her instances of confusion that she was testifying about. So she's the owner of Artistry. She's the daughter. Laura is the owner, Susan is the daughter, who's in charge of marketing and other activities. And there's an email exchange between a customer who was looking for a sterling piece of jewelry, an Artistry piece of jewelry, and they contacted my client and said, we want to buy one of these. Now, that's one instance. Where is that in the record? I believe, Your Honor, it would be in the testimony of Laura Klempt. I'll have the site for you when I come back up on rebuttal. Okay. So we do have that, but forward and reverse. This is an owner of a store that says one of her customers was confused. No, this was a consumer, Your Honor, who reached out to Artistry, to my client, trying to buy a piece of jewelry that was actually a sterling piece. But forward and reverse confusion are not mutually exclusive. So that wasn't an instance of losing a sale. It was an instance of not getting a sale from somebody who wanted the other people. It wasn't that they wanted you and were confused. Correct, Your Honor. And the issue, Judge Sutton, on what happens at the consumer level is an issue that this Court has said you have to look at in terms of the relatedness of the goods factor. That's why I was emphasizing that. But the big picture issue that the Court needs to focus on is there's multiple kinds of confusion, and the Court has said they're all actionable. Yeah, but it doesn't work that you get to take types of confusion at different channels of commerce. I'm not accusing you of this, but in the abstract, you wouldn't be able to add up three weak cases of confusion and call it one when they're each distinct. Agreed. You have to look at them separately. Absolutely. There's not a lot of confusion evidence when it comes to the ultimate consumer. That's what I thought was true in this case. So that seems to me that it's more a case about the problem of confusion of the retail entity buying from wholesalers. It is, Your Honor, with this caveat, if you will. The issues at the consumer level are an important part of that because if I'm an independent retail jeweler, if I'm competing with Kay's, and I come to Artistry, I come to Artistry because I think they sell me good products that will add, that my customers will like, and that I want to have in my stores. When I see, wait a minute, I have Artistry products over here in my stores, and I'm telling my customers these are high-end, quality jewelry products, and across the mall Kay Jewelers is selling Artistry diamonds, that hurts me as the retail jeweler. Okay. So now on that confusion, again, just help me because maybe I didn't get the record right, but it seemed that that evidence of confusion was questions. And in each case, the questions aren't proof of confusion. Questions are proof that the buyer is discerning. That's why they ask the question, and then they get the answer, and confusion gone. In a reverse confusion case, Your Honor, as this court said in Ameritech and as Professor McCarthy has said in his treatise, the kind of confusion that arises in reverse confusion is questions because people think that the smaller senior user has somehow become affiliated or associated with the bigger junior user. But where's the case where you can say it's cognizable evidence of likelihood of confusion when in each instance the question is resolved so the point is clarified? The fact that the question came up, Your Honor, is actionable confusion. If someone says, Judge Sutton, are you selling your jewelry products to Kay Jewelers? That person, they ask the question because they're confused. They think you may be selling your products to Kays. That's exactly what reverse confusion is about. It seems to me in this setting where the buyer, the main buyer that we care about, is a very sophisticated retailer. They're buying in bulk. These are big sales. The fact that they're asking this and getting an answer proves how discerning they are. And then, of course, the confusion is gone because they get the honest answer. Confusion is gone, Your Honor, for that customer who bothered to ask the question. The problem with all kinds of confusion, frankly, whether it's forward confusion or reverse confusion, is it's very difficult to have evidence of that. Plenty of trademark cases say that you don't require any proof of actual confusion because it's so rare. So what you are concerned about is the people that don't ask. I thought lots of these cases had studies. I thought lots of these cases came with studies to prove this point. Some cases have surveys, Your Honor, but surveys are clearly not required. And when you have evidence of these kinds of questions, evidence of actual confusion, frankly, you don't need a survey. How many instances of confusion do you need to get it to a jury? One? Well, there's two questions, Your Honor, what you need to get past summary judgment and what you need to get to a jury. You don't need any. Zero. The court has said you don't need any evidence of actual confusion. But if there is any, if there is any evidence of actual confusion, it weighs in favor of a likelihood of confusion. How would the jury determine that? Just show them the pictures and say there's bound to be confusion or something like that? No, Your Honor, our witnesses would testify. Laura Klempt and Susan Klempt would say once Sterling rolled out with this huge national television advertising in 2013 at the end of the year, their phones started ringing off the hook. They got calls from people in the industry who knew them. They got calls from customers. They got calls from lots of people saying, hey, what's going on? Are you doing business with Sterling? Phones ringing off the hook? I thought there were like four inquiries. No, Your Honor, there's over a dozen. The testimony of Laura and Susan Klempt was that there were lots of calls. They asked in the deposition only about certain ones that had been there. She made some notes about the calls and who they had talked to and what the conversation had been. But the evidence was clear that wasn't it. Those were the ones that they gave details about. I see my time is up. Well, we'll ask the other side, but I thought those were the only ones that she could specify. No, Your Honor, again, I believe the testimony of both Susan and Laura Klempt was that they gave details about all of the instances they were asked about and that there were others. One other thing, just to give you a chance to answer on your opening, and this won't be subtracted from your rebuttal. Forgive me, but my first reaction is artistry is not a very strong mark. In the world of jewelry and other customized craft-type things, it seems hard to talk about the product without using words like artistry. So I'm a little skeptical of the idea that this is much of a mark to begin with, and that, of course, is a big part of this inquiry. So why don't you explain what I'm missing when I have that reaction? Certainly, Your Honor. I think at two levels. As you know, you look at strength of a mark for both conceptual strength and commercial strength. On conceptual strength, first of all, Sterling conceded for purposes of the motion that we had valid rights. They didn't want to argue about that. In fact, frankly, they couldn't because they've claimed rights of their own. You can't talk out of both sides of your mouth. But if I'm understanding correctly, that PTO thing has lapsed. That's no longer registered. Just the first two. The last five are still out there. Just so I got that, they still have an artistry-related mark that's on file? Five of them. Okay. Artistry black diamonds, artistry yellow diamonds, artistry green diamonds, they're all still on the register. The only two that got canceled was in that early test period back in 2007 when they first started with no media support. They registered the words artistry diamond collection. Okay. So your first answer to this is it must be a strong mark because they've used it. That means nothing to me. I would say you're both deluded in the same way. So now what's your next answer? The question, though, is what's the evidence in the record of what any third party has done with artistry? It can't be just a reference to artistry in an ad for jewelry. That's not in a trademark sense. What the court looks for in third party use is are people using it as a trademark to brand their products? All we have here is this hearsay search report from three years ago that nobody ever authenticated and a list. But on the authentication point, they have someone that would testify live to it, right? On the search report, Your Honor, I have no idea. I don't know where it came from. We don't know who the person is who commissioned it. I can't imagine they'd call somebody from the search company. Those companies don't allow their people to testify. I don't know who would authenticate it. I don't even know who the person is who ordered it. Is that something you want to challenge, the regularity with which artistry is used in this and other businesses? The issue, Your Honor, is not how it's used. Yes or no on that one. Yes, Your Honor. You think artistry is used quite infrequently. We've got the two that happen to use it in this case. You have two that use it as a mark. I'll give you a good example. They cite a use by De Beers Diamond Company. If you go to the De Beers site, De Beers has four different panels you can choose. One is about our products. The other one is about the artistry of our products. The other is about the source of our products. And then there's a fourth one. I forget what it is. That's not a trademark use. That's not use of the word artistry to brand a jewelry product. And that's exactly what we don't have. You've said many times that context matters for third-party use. You have to show what the use was. You have to show. The district court in this case made a finding that there were numerous current nationwide uses of artistry for jewelry products. There is no evidence other than the list they submitted. So we're back to the survey point.  We'll give full rebuttal. Thank you. Thank you, Your Honor. Okay. Go ahead. Yeah. Good morning. Good morning. May it please the court. My name is Andrea Calveruso from Kelly Dry and Warren, and we represent Sterling Jewelers, Inc. in this matter. To begin with, we note that we don't believe there are any disputes about the underlying facts. We believe that the dispute here is a legal question. It's a legal question as to whether or not the facts in the record are enough that a reasonable jury would find a likelihood of confusion in this case, and we believe that there are not. This isn't a case of a big company sweeping in and stealing a valuable trademark from a small competitor. In fact, Sterling didn't even know Artistry Limited existed until it received a cease-and-desist letter in 2014, which was nine years after it started using the mark in the marketplace and seven years after it obtained U.S. trademark registrations for the Artistry Diamonds mark. And it's not surprising because what's important here is that the predominant business of Artistry Limited is unbranded-use sale of jewelry. So it's not a surprise that we didn't find out about them. In fact, they operate in a totally separate channel of trade in the jewelry industry, and what they do is they purposefully have an unbranded business model because they believe that that is beneficial to their consumers. And why that's important is that the Sixth Circuit has recognized that it's the party's predominant uses of their marks in the marketplace and with respect to their goods that should be considered when weighing the Frisch factors. For example, ThermoScan, Progressive, Kellogg, and AutoZone were all cases where this court determined that even minimal overlap in the party's goods and channels of trade was not enough to preclude summary judgment for the defendant. And here it's important to know- He just made the point that there's two different places of potential confusion. He says, well, we have evidence of confusion with the ultimate consumers. So what's your response to that point? My response to that point is twofold. Number one, even if there were some rogue retailers who went out and put Artistry Limited on their website, which, in fact, there's only one instance of in the record, and we submit that the court should not consider anything that's not in the record because there's no indication of what these other websites look like. Even if that's the case, that is, at most, one of about 650 of Artistry Limited's retail customers, which is 0.03%, if I did the math right, of their consumers. And so the predominant use of this in the market is unbranded. What kind of proof do they need to do to present it to a jury and get off the summary judgment? On this point, Your Honor, on the retail- For that, yes, the confusion. Okay. On the confusion, I believe that they would have to show that the predominant use of this mark is with retailers, their customer retailers, showing it, using it as a brand to brand jewelry. It's important here that the jewelry that is sold by Artistry Limited to the retailers is unbranded. There's nothing in the record, by the way, that says that Artistry Limited's retailers do anything at the point of sale. They testified that they show the catalog to their consumers when they're trying to pick out a product.  The testimony in the record makes clear that what this catalog looks like when it's open and they're showing it to a consumer is there are images on the page and then a model number. Each of those images doesn't have Artistry Limited next to it. Artistry Limited is on the bottom of the catalog where you would normally see a supplier. So what consumers are looking at when they pick the jewelry is actually a picture of the jewelry and the model number. With respect to the website- Just help me out anyway in terms of what you're getting at with this point. Are you trying to make the point that they're not using Artistry Limited as a mark? Most of the time when they're selling, Artistry Limited is the name of the company. It appears on the front of the catalog, but they're really not using it as a mark. Is that the point you're trying to make? That's exactly right. The second point, Your Honor, is that even if there were a handful of websites that listed Artistry Limited as a supplier, there's a number of reasons why that doesn't create confusion. Number one, again, it's not the majority. It's the vast minority of the uses. And in this court, it's important that you look at the predominant use. In Thermoscan, there was only a 20% overlap. In the AutoZone case, there was a 1% overlap that the two stores were selling the same product and that this court found that that was not enough for a likelihood of confusion. And so my first point is that, you know, predominance matters. And the second point is that even if you looked at the retailers, which we don't think you should, they don't compete, as Your Honor alluded to earlier, with Sterling. In fact, Artistry's own witnesses testified that they think they're totally separate. Their retailers sell high end, and Sterling's stores are in malls and are, to their impression, you know, mass market and not the same quality. What do we do with the point, which seems pretty helpful to them, that it's funny for you to maintain that Artistry's a weak mark when it's used as a mark when you've registered it? So in response to that, Your Honor, I would say two things. Number one, the context matters. So how Artistry uses its mark as a service mark decidedly in an unbranded business model versus Kay Jeweler, who was used at mass market and has tried to saturate the market, as they say, and use it actually as a brand-to-brand jewelry. What matters is the commercial impression of the consumer. And as this Court said in the progressive case, merely saying we advertise to consumers or merely saying the market is conceptually strong, which I think is what you were getting at, is not enough. They need to prove, regardless of third parties, that the relevant consumers believe that recognize that their mark has strength in the marketplace, and we contend that they didn't do that. Does your client realize you could lose by winning in this case? In other words, they've invested a lot in Artistry diamond collection, and, you know, it's not inconceivable. You'd get a ruling that says Artistry's a remarkably weak, unprotected mark. It's like, you know, gorgeous jewelry, gorgeous diamond collection, exquisite diamond collection. On and on we go. I think that's a fair point, Your Honor, but we believe that this case factors not only on the strength of the mark, but really how are each party using the mark and what channels of trade they're in and whether or not consumers are going to be confused. It's one of the factors. Correct. Yes. Well, are you in agreement with him that it's a strong mark? No. I think that conceptually it is a suggestive mark. I think the second thing that the court has to look at in terms of that Frisch factor is whether or not there's commercial strength. And the commercial strength has to be attached to the plaintiff. Correct? So the plaintiff is not showing that the consumers recognize them, that mark, as emanating with, sorry, limited as a source. And so that's really the factor, I think, that is most important on the strength of the mark in this instance, because there's no evidence of that. They don't even have, in most of these cases, you would have a plaintiff that has a state or a U.S. trademark registration. And so there are some presumptive rights which are accorded to that, you know, the strength of the mark. Here there is no registration. They're relying on common law rights, and they're arguing that it has commercial strength, and they haven't proven that. It's not in the record. That's our position on the strength of the mark. With respect to the one instance of confusion, if I might address that, Your Honor, the record site is 47-2, Exhibit 12, 47-1, which was under seal. So that's page 99, lines 17 to 19. The email that Mr. Baber was referring to, actually we don't know whose customer it is, and if you look at the record, nobody knows. It was some person from a Gmail or a Yahoo or a very innocuous email account, wrote, sent an email to Artistry Limited and said, do you have this ring? There's no image of the ring. There was no mention in the consumer or the customer's email about Kay Jewelers or where they found it. It was the limited, the Artistry Limited's employee that suggested it was a Kay product in response. And so I would also say that even if that was deemed an evidence, an instance of confusion, one is not enough in cases like this where the plaintiff is alleging that we saturated the market. This court has found that it's not legally significant, even when there are a number of instances of actual confusion, as many as six. And so what we think is that when you look at the mentions, and there were 12 in the record that I counted. There were 11 that they had on a list, which isn't in the record, and then there was a 12th that was just so third-hand that Ms. Klempt couldn't even really explain what happened herself. It was third-party. Some retailer allegedly talked to her sales rep, and then Ms. Klempt wasn't even clear on what happened. What's your response to his point that, you know, you make the argument that, well, they were just questions, and each question got answered. It shows how discerning the buyers were. And he makes the point, well, no, questions are, you know, the question is likely to confusion, and so questions suffice. Well, Your Honor, I was unable, unfortunately, to find a case on point in this circuit, but in other circuits, such as the Eighth Circuit, the Duluth News Tribute case that was cited in our brief, and the Nora Beveridge's Second Circuit case, as well as the Fisher Store's First Circuit case, courts have held that a mere inquiry is not enough because it demonstrates that the person who's asking is not confused. Another point on their instances of alleged confusion that I think is important to note is that five of them were, admittedly, not Artistry's customers. They were, in fact, third parties. And this court recently found in Progressive that if it's not a consumer that's confused during making an inquiry, that's not legally significant. Three of the instances that they mention were actually not a question or confusion at all, but they were trusted advisors who were giving advice to Ms. Klemt about how she should deal with this because they clearly understood that Sterling was not associated with Artistry. And then, again, the one random example that I mentioned about the sales representative who came back and Laura Klemt could not really remember what exactly she said or what happened. In many of these cases, they put it on by having a survey or some kind of a poll to determine whether people are confused. Are you saying that that's required or can they do it in simple instances? Your Honor, I'm not saying it's required, and Mr. Weber is correct that you don't need to prove actual confusion to find a likelihood of confusion. But typically, you would expect after market saturation in over three years since the relaunch, by Sterling of the Artistry Diamonds products to amass market, that there would be many more instances of confusion. And in some cases, courts even find that such minimal confusion would weigh against confusion under the saturation of the market circumstances. So there's this piece of evidence that the district court credited about the use of artistry by 23 other entities, and the response is, well, that's hearsay, and it's summary judgment. You can only use evidence that would be admissible. So what do we do with that point? So, Your Honor, we believe that the unsworn statement, first of all, Limited did not raise a hearsay objection below, so we believe they waived it, number one. Number two, it's harmless error according to Hardin v. Jaco, 496 F3rd 579, because, as Your Honor mentioned, it would be very easy for us to simply have that report sworn and resubmitted, and that wouldn't change the outcome. Similarly, we could call a witness, obviously, and have her declare that she actually went and looked at these Internet sites. So, I mean, how does this work? I mean, because you're right, live testimony would solve the problem, but usually you have to identify the person ahead of time. So I think there's two separate pieces in the record that maybe you're conflating. Number one, there's the FAIR report, which is the expert report that we submitted, and in that report, Ms. FAIR notes that she had someone go to all of these websites, she looked at them, and she identified third parties. That was the unsworn statement. There's a second report. And that one could be corrected by that individual testifying live at a trial if there were a trial. Correct, or it could be corrected by us simply having her swear the report and resubmit it. They didn't raise this, so that's why we didn't get it sworn. In other words, that's your forfeiture point. Correct. Had they raised this, you would have done this below. It was harmless error. Okay, so as to the second one. As to the second one, we don't believe, if you look at the district court's decision, that he actually relied on that. But in that case, we would be able to, if we had to call a witness, we could call the individual who had it commissioned. And normally, what that report was, Your Honor, was a clearance report. In trademark practice, a lot of times what happens is for a company to do its diligence, they go out and they hire this core search, which is a provider of these services. And they run a report, and then the lawyers look at the report, and they give their opinion as to whether or not there's a problem. And so we certainly would be able to get someone who commissioned the report to testify. But I think the important thing is, and the reason that I don't find it problematic on appeal, is because it's not even necessary for us to show these third-party uses. We think that there are at least three uses of artistry in the jewelry industry by third parties that the clemps testified to, one of which is their own customer. That's in the record. The other thing is that, as I said before, the strength of the mark is dependent upon the plaintiff demonstrating that their consumers recognize the mark and that it has commercial strength. And that was important in the Progressive case that was just decided by this Court. And so this is not a case where there is an incontestable trademark registration as it somehow comes up, and then it's beholden on the defendant to rebut that presumption by saying, look, there's all these third parties out there. That's not the case here. Here, there's not even a trademark registration to begin with that's owned by Limited. They simply use common law use. Yes, we conceded for purposes of the motion. We'll say that they use it as a service mark, but that doesn't mean we concede that it's a strong mark or that it's commercially recognizable by the consumers. And we think that's really the important point on the strength of the mark. You keep saying I feel a little clueless, but you keep using the phrase service mark. That's distinct from? I'm sorry, Your Honor. Yes, so in the trademark parlance, and it's not really that different, but a trademark is a mark that you use to brand goods, and a service mark is simply a mark that you use to brand services. So in this case, Artistry Limited is using it as a brand name, and the service that they are providing is the sale of unbranded wholesale jewelry to retail professionals. That was the distinction I was making. You still have a little more time. Your friend on the other side got extra time, so if you want more time, you can have it, but you don't have to keep talking. If I may, I'd just like to make a few final points to the panel then, please. So I think it's important that the court examine the predominant uses of the marks by the parties. This is very important, and it's been found in many cases in the Sixth Circuit to be important in the Frisch analysis. And it's very important to note that Artistry's whole business model is unbranded. They go out of their way to make sure they're unbranded. They don't brand the jewelry that they sell. There's no evidence in the record that suggests that they brand the jewelry in any way. In fact, they won't even give a catalog to an industry professional unless they're vetted. Their website doesn't let you look at the products unless you have a retailer password. They discourage their retail consumers from even showing the Artistry brand to their customers. In fact, the reason they found out a handful of their retailers was actually using Artistry Limited to identify the supplier on their websites was because they, by accident, found them when they were rebuilding their website. And when Ms. Klempp was asked why was this list of websites brought to your attention, she said, well, because we encourage our retailers not to expose our Artistry Limited brand to consumers. And therefore, this is on my list of things to deal with. So we think that's a very important point here. All right. I think we understand your argument. Thank you so much. Thank you very much. Mr. Babier, you've got your rebuttal. Thank you, Your Honor. Yes, sir. Very quickly, I just want to start where Ms. Calaversa just ended, which is this notion of Artistry Limited, there's no brand awareness for it. Laura Klempp testified under oath that the use of the Artistry name by their customers, quote, is a frequent thing because even though we're kind of an unbrand, we're also a brand to our customers, and they often use our name to their customers, the retail customers. And so their customers are aware that they're buying Artistry jewelry in spite of the fact we're not promoting ourselves as a brand. She had other testimony, as did Susan Klempp. Your Honor, you just heard from Sterling's lawyer that they're really challenging whether we're even using this as a mark. They conceded that for purposes of summary judgment. We pleaded consistently, and we've said all along we use Artistry as a mark. We use it as a trade name, and she just said we actually use it as a service mark as well. They acknowledged we have valid rights, so that's not an issue on this appeal, and the district court seemed to accept that. She talked a bit about association, commercial strength, and this notion about inquiries and whether that's actual confusion. The fact that all those people contacted Artistry when Sterling started this massive national advertising, that evidence shows that Artistry, the name, was associated with my client. It shows that those people knew that in the jewelry world, we are Artistry. That's why the evidence of actual confusion is so compelling, and why when you have it, it has to be part of the record that precludes summary judgment. What you did not hear from her, Your Honors, is where in the record is there any evidence to support the district court findings about current nationwide use of all these other Artistry marks? So on that point, she said that you didn't raise this below, and is that right? Because normally, it's a surprising problem to have in front of us, because if someone says, wait a second, you can't use this unless someone attests it's true or is going to testify live, you fix the problem there. So how did that not happen here? Two issues, Your Honor. First is the court search. There are two different ones, so distinguish them. The court search, we absolutely said, this is hearsay. Nobody's authenticated it. How about the other one? On the expert, we pointed out that she was opining as to things that she had no business opining about. She was a damages expert, and she was a spoon fed. So did you raise the hearsay problem? We raised that she could not give competent testimony about likelihood of confusion. So you didn't raise the hearsay problem as to that one? We did not use the word hearsay in our objections to Ms. Fair's report. That's correct, but the problem with Ms. Fair's report is not. It's not a hearsay problem? Is that what you're saying? No, no, no. The problem is, take it at face value for what it says. It's just a list. It has no information about, well, who is this user? When did they start using it? How did they use artistry? Have they ever sold any products to anybody? That's the context that this court requires for third-party use. It's not just— So as to the other one that you did raise the hearsay objection, did Judge Adams mention that? He mentioned that Sterling had put in this evidence of third-party uses. So he didn't mention either of them by name, frankly. He didn't mention either the expert report or the court search report. So you have not heard from Sterling where the evidence is that supports the summary judgment. And one final point, if I may, Your Honor, because I see I'm out of my time, but this court, like all the courts, you can look at trademark cases and try and—sometimes they seem inconsistent, where you've got this factor over here and this factor over there. I think on this issue of the goods and how similar are the goods, there's an easy way to harmonize the relevant cases here. The question you ask is where are these goods ultimately going to end up? Who is the ultimate consumer for these goods or services? If you look at cases like homeowners, right, you had one product sold just to real estate brokers. Other services sold to homeowners. They wound up in different places. Here it's jewelry purchasers in both cases. So you'd like us to focus mainly on the end buyers? The question—only on the issue, Your Honor, of the relatedness of the goods. The goods here are jewelry, and we both use the same marks, and there's been actual confusion. All right. Thanks to both of you for your helpful briefs and for answering our questions. We appreciate it. Case will be submitted, and the clerk may call the next case. Thank you, Your Honor.